**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PALMCO ADMINISTRATION, LLC d/b/a
INDRA ENERGY ADMINISTRATION,

              Plaintiff,

    v.

PRIME CONNECT SALES LLC
and NEIL PATEL,

              Defendants.

Civil Action File No. 1:24-cv-09409

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

---

Palmco Administration, LLC d/b/a Indra Energy Administration ("Plaintiff" or "Palmco")

by and through its undersigned counsel, complaining against Defendants, Prime Connect Sales

LLC ("Prime Connect ") and Neil Patel ("Patel" and collectively with Prime Connect,

"Defendants"), avers as follows.

## THE PARTIES

1.  Plaintiff Palmco is a multi-member limited liability company organized and existing

under the laws of the State of New York, with its principal place of business located at 8751 18th

Ave., Brooklyn, NY 11214. It does business as Indra Energy Administration.

2. Palmco has no parent corporation or subsidiaries, and there is no publicly held

corporation owning 10% or more of its stock/units.

3. Robert Palmese, a citizen and resident of New York, holds a twenty five percent (25%)

ownership interest in Palmco.

4. Christina Palmese-Roosen, a citizen and resident of New York, holds a twenty five

percent (25%) ownership interest in Palmco.

5. Ronald Palmese, Jr., a citizen and resident of New York, holds a twenty five percent (25%) ownership interest in Palmco.

6. Stephen Palmese, a citizen and resident of New York, holds a twenty five percent (25%) ownership interest in Palmco.

7. Defendant Prime Connect is a single-member limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business located at 19 Almark Terrace, Asbury Park, NJ 07712.

8. Defendant Patel is an adult individual and the sole owner, officer, principal, and member of Prime Connect Sales LLC. He is a citizen of New Jersey, residing at 19 Almark Terrace, Asbury Park, NJ 07712.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

10. This Court has personal jurisdiction over Defendant Prime Connect and Defendant Patel pursuant to Section 11(f) of the Independent Contractor Consulting Agreement (the "Agreement"), annexed hereto as **Exhibit A ("Ex. A")**. Under the terms of the Agreement, each Defendant "irrevocably submits to the exclusive jurisdiction of any state or federal court within New York County, New York with respect to any cause or claim arising under or relating to this Agreement," and "irrevocably consents to personal jurisdiction in New York and to the service of process by registered mail or personal service, irrevocably waives any objection based on forum non conveniens with respect to such a court, and irrevocably waives any objection to venue in such court." **Ex. A, § 11(f)**.

11. Venue in this District is proper pursuant to 28 U.S.C. § 1391 and Section 11(f) of the Agreement.

## FACTUAL ALLEGATIONS

12. On or about August 1, 2024, Plaintiff and Defendants executed the Agreement.

13. The Agreement defines the term "Consultant" as "Prime Connect Sales LLC . . . and its respective past, present and future affiliates, successors, assigns, principals, officers, members and duly authorized representatives." **Ex. A, Preamble**.

14. Upon information and belief, Defendant Patel is the sole owner, officer, principal, and member of Defendant Prime Connect.

15. Defendant Patel negotiated and signed the Agreement on behalf of himself and Defendant Prime Connect.

16. Upon information and belief, Defendant Patel personally participated in and directed the wrongful conduct complained of herein.

17. Under the terms of the Agreement, Defendants agreed to market Plaintiff's services, on behalf of Plaintiff, by engaging in door-to-door solicitation of prospective customers, and in exchange, Plaintiff agreed to pay to Defendants a fixed sales commission for each customer enrolled in a residential electricity or natural gas account with Plaintiff.

18. Between August 1 and September 10, 2024, Defendants submitted enrollments to Plaintiffs, for which Plaintiff paid to Defendants $156,160.81 in total commissions (the "Commissions").

19. Within days of receiving the first enrollments, Plaintiff began to receive complaints from customers asserting that they had not agreed to enroll in a residential electricity or natural gas account with Plaintiff.

20.  Plaintiff directly contacted customers purportedly enrolled by Defendants to verify the validity of their contracts and associated enrollments, and upon further investigation, determined that Defendants enrolled customer accounts fraudulently.

21. Plaintiff was also contacted by the Pennsylvania Attorney General's Office, the Pennsylvania Public Utility Commission, and the local distribution utility (collectively, the "Pennsylvania Regulators") regarding fraudulent acts committed by Defendants and numerous customer complaints filed against Plaintiff claiming that their enrollment submitted by Defendants was not authorized and requesting cancellation of their accounts. *See* September 12, 2024 Demand Letter, annexed hereto as **Exhibit B ("Ex. B")**.

22.  Plaintiff immediately cancelled all customer enrollments submitted by Defendants. *Id*.

23.  In addition, given Defendants' improper conduct and clear breach of the Agreement for failure to adhere to applicable law in conducting services on Plaintiff's behalf, Plaintiff terminated its relationship with Defendants effective September 10, 2024. *Id*.

24. Under Section 3(b) of the Agreement, Plaintiff is entitled to recoup any sales commission paid to Defendants for each customer enrolled in a residential electricity or natural gas account with Plaintiff, if the customer, within forty-five (45) days of the date of sale, cancels its contract. **Ex. A, § 3(b)**.

25.  Accordingly, on September 12, 2024, Plaintiff demanded the return of all payments made to Defendants under the Agreement between August 1 and September 10, 2024, *i.e.*, the Commissions.

26.  To date, Defendants have failed to repay any portion of the $156,160.81 in Commissions paid and have otherwise improperly retained the same.

27. In addition, under Section 9(a), Defendants agreed to indemnify Plaintiff, jointly and severally, for actual loss and consequential damages suffered by Plaintiff arising out of Defendants' breach of the Agreement, or any other act or omission that results in any claim against Plaintiff. **Ex. A, § 9(a)**.

28. To date, Defendants have failed to indemnify Plaintiff for damages incurred as a result of Defendants' breach of the Agreement, and the claims against Plaintiff submitted to the Pennsylvania Regulators for Defendants' fraudulent acts. These damages include, but are not limited to, loss of revenue, unrecovered costs, reputational harm and the loss of customer goodwill.

## COUNT I
### Breach of Contract

29. Plaintiff repeats, realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

30. The Agreement is a valid, binding, and enforceable contract.

31. Defendants breached their obligations under the terms of the Agreement by: (a) fraudulently enrolling customers in a residential electricity or natural gas account with Plaintiff, thus failing to adhere to applicable law in conducting services on Plaintiff's behalf; (b) failing to return Commissions paid to Defendants for customers who cancelled their contract within forty-five (45) days of the date of sale, and (c) failing to indemnify Plaintiff for the damages incurred as a result of the claims as described in Paragraph 22, *supra*.

32. On September 12, 2024, Plaintiff served Defendants with a formal demand for return of the Commissions.

33. Defendants have improperly retained the Commissions and have failed to repay or otherwise reimburse Plaintiff for any portion thereof.

34. Plaintiff has fully complied with its obligations under the Agreement.

35. As a direct, proximate, and foreseeable result of Defendants' breach of the Agreement, Plaintiff has suffered damages in an amount to be proven at trial, but not less than $156,160.81.

## COUNT II
### Unjust Enrichment

36. Plaintiff repeats, realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

37. This claim is pleaded in the alternative to Count I – Breach of Contract, *supra*.

38. Plaintiffs paid to Defendants $156,160.81 in Commissions for services purportedly rendered by Defendants under the Agreement.

39. As Plaintiffs subsequently learned, Defendants failed to adhere to applicable law in conducting said services.

40. In addition, all customers purportedly enrolled by Defendants cancelled their contracts within forty-five (45) days of the date of sale.

41. Defendants have ignored Plaintiff's demand for return of the Commissions.

42. By virtue of the foregoing, Defendants have been unjustly enriched at the expense of Plaintiff by their unlawful, inequitable, and wrongful conduct.

43. Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefit of the Commissions.

44. As a direct, proximate, and foreseeable result of Defendants' breach of the Agreement, Plaintiff has suffered damages in an amount to be proven at trial, but not less than $156,160.81.

## COUNT III
## Fraud

45. Plaintiff repeats, realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

46. Defendants made knowing misrepresentations of material fact to Plaintiff concerning the enrollment of customers in residential electricity or natural gas accounts.

47. Specifically, Defendants submitted enrollments to Plaintiff that were not authorized by the customer.

48. Defendants made these misrepresentations with the intent to deceive Plaintiff as to the legitimacy of each enrollment, and ultimately to induce Plaintiff to pay Defendants the commissions they would have been owed under the Agreement had Defendants properly performed.

49. Plaintiff relied on Defendants' misrepresentations to its detriment.

50. As a result of Defendants' misrepresentations, Plaintiff has suffered monetary damages in an amount not less than $156,160.81, as well as reputational harm and the loss of customer goodwill.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

(a) An award of compensatory damages to Plaintiff against Defendants, jointly and severally, in an amount not less than $156,160.81, inclusive of pre- and post-judgment interest; and

(b) For such other relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury as to each and all issues and claims so triable under applicable law.

Dated: December 20, 2024
New York, New York

Respectfully submitted,

**STEVENS & LEE, P.C.**

*/s/ Bradley L. Mitchell*
Bradley L. Mitchell, Esq.
485 Madison Ave., 20th Floor
New York, NY 10022
(212) 319-8500
bradley.mitchell@stevenslee.com

Michael A. Cedrone, Esq.
(*pro hac vice* application forthcoming)
510 Carnegie Center Drive
Suite 400
Princeton, NJ 08540
(609) 718-0920
michael.cedrone@stevenslee.com

*Attorneys for Plaintiff*
*Palmco Administration, LLC*
*d/b/a Indra Energy Administration*

8

# Exhibit A
**Independent Contractor Consulting Agreement,
dated August 1, 2024**

INDEPENDENT CONTRACTOR CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("Agreement") dated  August 1, 2024 is made between Palmco Administration, LLC d/b/a Indra Energy Administration, a company with an office located at 8751 18th Avenue, Brooklyn, NY 11214 ("Company"), and **Prime Connect Sales LLC** at 19 Almark Terrace Asbury Park NJ 07712 w/ EIN 47-4656237  and its respective past, present and future affiliates, successors, assigns, principals, officers, members and duly authorized representatives (collectively, the "Consultant"), for the purpose of setting forth the exclusive terms and conditions by which Company desires to acquire Consultant's services (collectively, the "Parties"). This Agreement supersedes any and all previously executed agreements between the Parties.

In consideration of the mutual obligations specified in this Agreement, the parties, intending to be legally bound hereby, agree to the following:

1.    Services.

(a)    In exchange for the consideration outlined herein, the sufficiency of which hereby acknowledged, Consultant agrees to solely perform door to door solicitations of prospective customers on behalf of the Company, as well as any ancillary services related door to door solicitations (collectively, the "Services").

(b)    Consultant agrees to keep Company updated, promptly upon regularly, with or without Company's request, of any progress, problems, and/or developments of which Consultant is aware regarding the Services.  Company shall have the right to require such updates in writing from Consultant in a format specified by, or acceptable to, Company in its sole discretion.

2.    Independent Contractor.

(a)    Company and Consultant expressly agree and understand that Consultant is an independent contractor and nothing in this Agreement nor the services rendered hereunder is meant, or shall be construed in any way or manner, to create between them a relationship of employer and employee, principal and agent, partners or any other relationship other than that of independent parties contracting with each other solely for the purpose of carrying out the provisions of the Agreement. The Parties agree and understand that Consultant is not the agent of Company and is not authorized and shall not have the power or authority to bind Company or incur any liability or obligation, or act on behalf of Company.

(b)    In fulfilling the Services on behalf of Company, Consultant shall be solely responsible for the direction and control of its owners, principals, employees, agents, servants, contractors, subcontractors, and advisors ("workers"), including selection, hiring, firing, supervising, directing, training, setting wages, hours and working conditions, paying compensation or adjusting grievances of the owners, principals, employees, agents, servants, contractors, subcontractors, or advisors of Consultant.

(c)    While Consultant shall be required to meet all of the obligations assumed hereunder,

1

Consultant is entitled to exercise the discretion and judgment of an independent contractor in determining the methods and means to be used in performing the Services specifically outlined in Section 1(a) of the Agreement. This means that, while Company may provide Consultant with general guidance to assist Consultant in delivering the Services to Company's satisfaction, Consultant is ultimately responsible for directing and controlling the performance of the task and the scope of work (including, but not limited to, the training and supervision of Consultant's employees, if any), in accordance with jurisdictional requirements (including satisfying regulatory requirements and obligations, including as to certain legally required trainings, standards and guidelines), Consultant is ultimately responsible for directing and controlling the performance of the tasks and the scope of work (including, but not limited to, the training and supervision of Consultant's employees, if any), in accordance with the terms and conditions of this Agreement. Consultant shall use its best efforts, energy and skill in its own name and in such manner as Consultant sees fit. In addition, Consultant must provide its own sales leads in addition to any leads which may or may not be provided by Company.

(d)     Company shall exercise no disciplinary authority over Consultant or Consultant's owners, principals, employees, agents, advisors or other third parties retained by Consultant, and has no authority to hire or fire any such owner, principal, employee, agent, servant, advisor or other third party that Consultant may employ or engage to perform work.

(e)     As an independent contractor, Consultant is free to work for others and hold itself out to the public, under its own business name, in a manner consistent with Section 6(a) of this Agreement, and the Company similarly imposes no similar restrictions on Consultant's employees or workers. The Consultant shall not be required to grant priority status to the Company.

3.     Consideration/Compensation.

(a)     In exchange for the full and satisfactory performance of all Services to be rendered to Company hereunder (as determined by the Company), Company shall provide Consultant, as full and complete compensation for the Services rendered hereunder, sales commissions at a rate of ONE HUNDRED SIXTY DOLLARS ($160) for each accepted residential electricity account and ONE HUNDRED FORTY FIVE DOLLARS ($145) for each accepted natural gas account Consultant acquires for the Company based on a targeted usage of 8,000kWh/700 Therms. This means that accounts over or under the usage target will receive commission under or over the standard commission rate based on the percentage. For each sale with usage that has an average <8,000kWh/700 Therms for that pay period, Consultants standard commission rate will be prorated for that pay period based on its percent achievement of the 8,000kWh/700 Therms target. For each account with usage that has an average >8,000kWh/700 Therms for that pay period, Consultants standard commission rate will be increased based on that accounts percent achievement of the 8,000kwh/700 Therms target. Whenever the usage has not been provided by the utility at the time of payment, the consultant shall be paid at the standard commission rate. An account will be deemed "accepted" by Consultant for the Company, and Consultant will only be eligible for commission, where a new customer signs a contract with, and receives services from, the Company as the direct and sole result of Consultant's Services. If, for any reason, a prospective customer does not sign a new contract with the Company or signs a new contract with the Company but does not receive services from the Company (including, but not limited to, because of a block or invalid account number), Contractor will not be entitled to any commission.

2

(b)    In the event any account acquired by Consultant cancels its contract within forty-five (45) days of the date of sale, the Company shall be entitled to recoup any commission paid to Consultant for the acquisition of such account. Consultant hereby authorizes the Company to deduct any such charge-backs from subsequent commission payments that otherwise are due. If such deduction is not possible, Consultant hereby agrees to return such commission to the Company within forty-five (45) days of notification of the cancellation of the contract.

(c)    On or before the last day of each week, Consultant shall provide an invoice to the Company setting forth in detail the accounts Consultant acquired for the Company during that week. Company shall remit payment to Consultant within SEVEN (7) days of receipt of the invoice. Failure by Consultant to submit a detailed invoice shall be grounds for Company to withhold any and all payment(s).

(d)    If a sales campaign has ended, any invoices outstanding or not yet submitted, will be payable, net of charge-backs, 60 days after the last date of sales made. If a sales campaign has ended, any monies due to Consultant, net of charge-backs, will be paid 60 days after the last date of sales made. If such deduction is not possible, Consultant hereby agrees to return such commission to the Company within thirty (30) days of notification of the cancellation of the contract.

(e)    Consultant shall not be entitled to receive any other compensation or any benefits from Company. Except as otherwise required by law, Company shall not withhold any sums or payments made to Consultant for social security or other federal, state or local tax liabilities or contributions, and all withholdings, liabilities, and contributions shall be solely Consultant's responsibility. Further, Consultant understands and agrees that the Services are not covered under the unemployment compensation laws and are not intended to be covered by workers' compensation laws.

4.    Personnel Utilized by Consultant.

(a)    Consultant shall, at its own expense, retain all employees, agents, servants, advisors or any other third party necessary to carry out the Services. Company shall not be responsible for the wages, expenses, employment taxes (federal or state), social security, or insurance of Consultant or Consultant's owners, principals, employees, agents, servants, advisors, workers or any such third party.

(b)    Consultant agrees to comply with industrial accident laws, environmental laws, the Occupational Safety and Health Act (OSHA), workers' compensation laws, nondiscrimination laws, tort law, employment tax requirements, the federal Fair Labor Standards Act, state and local wage and hour laws, any and all minimum wage, overtime or other compensation or benefit-related laws, ordinances or rules, and other local, state, and federal laws, regulations and executive orders, including those applicable to COVID-19 and/or any other communicable disease, applicable to employees and employers with respect to all of Consultant's owners, principals, agents, servants, advisors, or any other third party necessary to carry out the Services.  Consultant shall maintain workers' compensation insurance coverage and pay into any applicable unemployment fund for any owner, principal, employee, agent, servant, advisor, worker or other third party whom Consultant employs in the performance of the Services.  In addition, Consultant represents that it will withhold state and federal income taxes from

3

wages paid by Consultant to Consultant's owners, principals, and employees, and Consultant will be solely responsible for all employment taxes owing to any state government or the federal government.

(c)     As provided further herein, Consultant shall indemnify and hold Company harmless from any liability arising from any and all acts of Consultant or Consultant's owners, principals, employees, agents, advisors, workers or other third parties retained by Consultant, including as to any violation or alleged violation of the above paragraphs and respective subsections.

(d)     As is specifically required by applicable law, rule, or regulation, and not discretionary requirement of the Company, Consultant shall provide the Palmco Sales Practices and Conduct Training Manual located at the end of this Agreement, and any other document upon Company request, to its personnel employed to solicit potential customers pursuant to this Agreement and train its personnel using the same. It is understood that any person soliciting on behalf of the Company has been trained using the described manual, as well as any additional training the Consultant may provide. It is further understood and acknowledged that such training document(s) are being provided as a government/regulatory mandate, and not at the discretion or election of Company.

(e)     Consultant is required to have background checks done on all people (including, but not limited to, Consultant's agents, employees, vendors, or contractors) employed to solicit potential customers in person pursuant to this Agreement. The background checking service must be approved by the Company and each representative of Consultant will have to pass inspection by the Company in order to be able to solicit potential customers.

(f)     As required by the applicable government/regulatory requirements, all people (including, but not limited to, their agents, employees, vendors, or contractors) employed to solicit potential customers in person pursuant to this Agreement, must be badged and given an identification number. All badges and numbers must be approved by the Company in order to be issued.

(g)     As required by the applicable government/regulatory requirements, Consultant must maintain a Company-approved uniform for all people (including, but not limited to, their agents, employees, vendors, or contractors) employed to solicit potential customers in person pursuant to this Agreement.

(h)     Consultant shall acquire and maintain, at the minimum, $1,000,000 worth of insurance coverage in each State where Consultant is working, naming the Company as an additional insured on the insurance policy. No liability shall be incurred by the Company.

(i)     Cross recruiting is not permitted, with exceptions made at the discretion of the Company. Cross recruiting shall be defined to include Consultant recruiting personnel, whether intentionally or unintentionally, from another consultant working for the Company, regardless whether or not Consultant is working for the Company when such recruiting takes place.

5.     Nondisclosure.

(a)     Consultant understands that, in connection with its engagement with the Company, Consultant may receive, produce, or otherwise be exposed to the Company's trade secrets, business,

4

proprietary and/or technical information, including, without limitation, information concerning customer lists, customer support strategies, employees, research and development, financial information (including sales, costs, profits, and pricing methods), manufacturing, marketing, proprietary software, hardware, firmware, and related documentation, inventions (whether patentable or not), know-how, show-how, and other information considered to be confidential by the Company, and all derivatives, improvements and enhancements to any of the above (including those derivatives, improvements and enhancements that were created or developed by Consultant under this Agreement), in addition to all information Company receives from others under an obligation of confidentiality (individually and collectively "Confidential Information").

(b)    Consultant acknowledges that Confidential Information is the Company's sole, exclusive and extremely valuable property. Accordingly, Consultant agrees to segregate all Confidential Information from information of other companies and/or entities and agrees not to reproduce any Confidential Information without the Company's prior written consent, not to use Confidential Information except in the performance of this Agreement, and not to divulge all or any part of Confidential Information in any form to any third party, either during or after the term of this Agreement, without the written permission of the Company. Neither Consultant nor any personnel of Consultant shall be permitted to copy, whether via photo-copier, facsimile, scanner, hand writing or any other electronic or manual means, Confidential Information including, but not limited to, the customer sign-up sheet (also known as the "agreement" or "contract"), or any customer information (in hard copy or electronic /soft copy) with respect to sales submitted. Upon termination or expiration of this Agreement for any reason, Consultant agrees to cease using and to return to the Company all whole and partial copies and derivatives of Confidential Information, whether in Consultant's possession orunder Consultant's direct or indirect control, including any computer access nodes and/or codes, and to arrange for the return of such materials by all Consultant Employees. This provision survives termination of this Agreement and applies to Confidential Information discovered by Consultant following termination.

(c)    Consultant warrants that Consultant's performance of all the terms of this Agreement does not and will not breach any agreement entered into by Consultant with any other party, and Consultant agrees not to enter into any agreement, oral or written, in conflict herewith. In addition, Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use such information only for certain limited purposes. Consultant agrees that Consultant owes the Company and such third parties, during the term of the Consultant's relationship with the Company and thereafter, regardless of the reason for the termination of the relationship, a duty to hold all such confidential or proprietary information in the strictest of confidence and not to disclose such information to any person, firm or corporation (except as necessary in carrying out Consultant's work for the Company consistent with the Company's agreement with such third party) or to use such information for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with such third party).

(d)    Consultant also agrees that during the consultancy with the Company that Consultant shall not make, use or permit to be used any "Company Property" other than for the benefit of the Company. The term "Company Property" shall include all notes, memoranda, reports, lists, records, drawings, sketches, designs, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other

5

materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company Property in Consultant's possession, custody or control. Consultant further agrees that Consultant shall not, after the termination of the consultancy, use or permit others to use any such Company Property. Consultant acknowledges and agrees that all Company Property shall be and remain the sole and exclusive property of the Company. Immediately upon the termination of Consultant's consultancy, Consultant shall deliver all Company Property in Consultant's possession, and all copies thereof, to the Company.

6.      Non-competition; Non-solicitation.

During the period of this Agreement, Consultant shall not, directly or indirectly, alone or as a partner, joint venture, consultant, contractor, lender, officer, director, employee, stockholder or investor of any entity, engage in any business or activity that is in conflict or competition with the Company or any products or services being created, developed, manufactured, marketed, distributed or sold by the Company. Further, (a) during the period of this Agreement and for one year thereafter, Consultant shall not, directly or indirectly, alone or as a partner, joint venturer, consultant, contractor, lender, officer, director, employee, stockholder or investor of any entity, solicit or do business with any customer of the Company or any potential customer of the Company with whom Consultant has had contact, or (b) during the term of this Agreement, or two years thereafter, employ, or knowingly permit any company or business organization directly or indirectly controlled by Consultant to employ or otherwise engage any person who is or was an employee, agent, representative or consultant of the Company at any time during the term of this Agreement or during the period of two years thereafter, or in any manner seek to solicit or induce any such person to leave his or her employment with the Company, or assist in the recruitment or hiring of any such person for such time period. Consultant's ownership of not more than one percent (1%) of the shares of any corporation having a class of equity securities traded on a national securities exchange or on NASDAQ Stock Market shall not be deemed, in and of itself, to violate the prohibitions of this paragraph.

7.      Non-Disparagement.

Consultant agrees that Consultant will not at any time make any written or oral statements, representations or other communications that disparage or are otherwise damaging to the business or reputation of the Company, other than to the extent necessary to respond in an appropriate manner to any legal process or give appropriate testimony in a legal or regulatory proceeding, or as may otherwise be required by law.

8.      Compliance with Law While Providing Services.

(a)      Consultant agrees to comply with all applicable laws in the performance of Consultant's obligations under this Agreement, including, but not limited to, any and all applicable "TCPA", "Do Not Call" or "Do Not Visit" laws and regulations. Consultant agrees to comply with all federal and local laws requiring registration or licensing to conduct telephonic or door-to-door solicitations, and all federal, state, and local laws and regulations, including those applicable to safely conducting door-to-door sales during the COVID-19 pandemic. In addition, Consultant agrees to retain documents and provide written proof of such compliance upon reasonable notice. "Scrubbing" from all "Do Not Call" lists shall occur once every 30 days. Should Consultant violate "TCPA", "Do Not Call" or "Do Not Knock" laws and regulations, their services can be suspended and or terminated

6

immediately.

(b)     To verify compliance with these laws, where recordings are required to be maintained in accordance with applicable regulations and/or law. Consultant shall provide Company with independent access to sales recordings upon request and in a time not to exceed twenty-four (24) hours. Such access to recordings shall be available for as long as Consultant is working on behalf of Company and thereafter to the extent required by applicable regulations and/or law.

(c)     The law and the policy of the Company prohibit discrimination and/or harassment on the basis of race, color, national origin, religion, sex, age, disability, pregnancy, alienage or citizenship status, marital status, creed, genetic predisposition or carrier status, gender identity, sexual orientation or any other characteristic protected by law, and prohibit retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports. If Company learns of unlawful discrimination, harassment, or retaliation, or other violations of law by Consultant, Company may terminate this Agreement. Consultant agrees thatConsultant will not violate the law and the policy of the Company by engaging in unlawful discrimination, harassment, or retaliation, and further agrees to report all incidents of discrimination, harassment or retaliation that Consultant becomes aware of while performing the Services, regardless of the offender's identity or position, or becomes aware of involving the Company's employees, to the Company in accordance with its policies.

9.     Indemnification/Release.

(a)     By Consultant's execution of this Agreement, and Consultant (at the corporate/business entity level) and Consultant's principals, officers and members (in their respective individual capacities) agree and affirm that they shall jointly and severally indemnify, defend and hold harmless Company, its officers, affiliates, directors, shareholders, employees, representatives and/or agents from any "Claims," liability, loss, cost, damage, fine, judgment, settlement or expense (including attorney's fees and litigation costs) arising out of Consultant's or its owners', principals', employees', agents', advisors', workers', or other retained third parties' performance or non-performance of their duties or the exercise of their rights pursuant to this Agreement, the Consultant's breach of the terms of this Agreement, an allegation or finding that Company is the joint employer or direct employer of the Consultant's owners, principals, employees, agents, contractors, advisors, workers or other retained third parties, or any other act or omission that results in any Claim against Company or its affiliates, directors, officers, employees, agents or assigns. For purposes of this indemnification, "Claims" means and includes all obligations, such as taxes in connection with business conducted by Consultant, actual and consequential damages, back pay, front pay, liquidated or punitive damages, multiple damages of any type, interest, and actual out-of-pocket costs incurred in the defense of any Claim, including accountants' fees, attorneys' fees and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel expenses. The Company shall have the right to defend any such Claim or Claims against it and be reimbursed for its actual attorneys' fees incurred under this Agreement.   This indemnity shall continue in effect even after, and notwithstanding, this Agreement's expiration or termination.  For the sake of clarity, the above indemnification obligation shall include any claims or liabilities relating to any alleged employment claims, wage and hour claims and alleged or actual exposure to, or illness from, any and all infectious diseases, bacteria, or viruses, including but not limited to MRSA, SARS, MERS, SARS-CoV-2, Ebola, Measles, Polio, pneumonia, tuberculosis, influenza, COVID-19 or any form of coronavirus, or any other endemic, pandemic, epidemic and/or any other outbreak or contagion.

7

(b)      Consultant agrees to indemnify and hold Company harmless from and against any and all Claims, demands, liabilities, damages, costs, or expenses (including without limitation attorney's fees, back wages, liquidated damages, penalties or interest) resulting from Consultant's failure to collect, withhold, or pay any and all federal or state taxes required to be withheld or paid by employers or employees, including, without limitation, any and all income tax, social security, FUTA taxes, and any other state or federal tax, assessment or obligation.

10.    Termination.

(a)      This Agreement shall be effective on the date hereof and shall continue until terminated by either party upon written notice. In the event of termination, Consultant shall, upon request, perform such work as may be requested to transfer work in process to the Company or to a party designated by the Company.

(b)      Notwithstanding any other provision in this Agreement, upon termination of this Agreement, the Company may offset any commissions owed to Consultant in the event the Company incurs any liability as a result of Consultant violating this Agreement or any of its terms. Further, any commissions owed by the Company to Consultant after termination of this Agreement are conditioned upon Consultant returning all Company Property and Confidential Information to the Company.

11.    General.

(a)      This Agreement does not create an obligation on Company to continue to retain Consultant beyond this Agreement's termination. This Agreement may not be changed unless mutually agreed upon in writing by both Consultant and Company's Managing Member, or other duly authorized individual.

(b)      Any waiver by Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision hereof.

(c)      Consultant hereby agrees that any breach of this Agreement by Consultant will cause irreparable harm to Company and that in the event of such breach or threatened breach, Company shall have, in addition to any and all remedies of law and those remedies stated in this Agreement, the right to an injunction, specific performance or other equitable relief to prevent the violation of Consultant's obligations hereunder.

(d)      Consultant hereby agrees that each provision herein shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein.  Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity, subject or otherwise so as to be unenforceable at law, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear.

8

(e)    The Company shall have the right to assign this Agreement to its successors and assigns, and this Agreement shall inure to the benefit of and be enforceable by said successors or assigns. Consultant may not assign this Agreement or any rights or obligations hereunder without the prior written consent of Company's Managing Member, or other duly authorized individual and this Agreement shall be binding upon Consultant's heirs, executors, administrators and legal representatives.

(f)    This Agreement and all aspects of the relationship between the parties hereto shall be construed and enforced in accordance with and governed by the laws of the State of New York without regard to its conflict of laws provisions. Each party hereto irrevocably submits to the exclusive jurisdiction of any state or federal court within New York County, New York with respect to any cause or claim arising under or relating to this Agreement. Each party hereto irrevocably consents to personal jurisdiction in New York and to the service of process by registered mail or personal service, irrevocably waives any objection based on forum non conveniens with respect to such a court, and irrevocably waives any objection to venue in such court. Nothing in this Section shall affect any party's right (1) to serve process in any other manner permitted by applicable law or (2) to enforce any judgment in any court or jurisdiction.

(g)    This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated herein. All other negotiations and agreements (written or oral) between the parties are superseded by this Agreement and there are no representations, warranties, understandings or agreements other than those expressly set forth herein. The language of all parts of this Agreement will in all cases be construed as a whole in accordance with its fair meaning and not strictly for or against either party hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Independent Consultant Agreement.

**Indra Energy Administration**

By _[signature]_

Name:  Robert Palmese

Title:  President / CEO

Date:    8/1/2024

CONSULTANT:
**Prime Connect Sales LLC**

By _[signature]_

Name: Neil Patel

Title: Owner

Date: 8/1/2024

9

# Exhibit B
**Demand Letter, dated September 12, 2024**



**Indra Energy**
1515 Market Street, Suite 1200
Philadelphia, PA, 19102

**w:** IndraEnergy.com
**e:** CustomerCare@IndraEnergy.com
**toll free:** 1 (888) 50-INDRA
1 (888) 504 6372

Via US Certified Mail and Email


September 12, 2024


Attn: Neil Patel
Prime Connect Sales LLC
19 Almark Terrace
Asbury Park, NJ 07712


## RE: BREACH OF CONTRACT AND DEMAND FOR PAYMENT


Dear Mr. Patel:

I am writing to formally demand the return of all payments made to you pursuant to the contract dated August 1, 2024 between Palmco Administration, LLC d/b/a Indra Energy Administration ("Indra" or the "Company") and Prime Connect Sales, LLC ("Prime Connect" or "Consultant") for door-to-door solicitations as well as any ancillary services related to door-to-door solicitations (the "Agreement").

Indra has been contacted by the Pennsylvania Attorney General's Office as well as the Pennsylvania Public Utility Commission, and the local distribution utility regarding fraudulent acts committed by several of your agents in performing the services contemplated by the Agreement. Numerous consumers in the state of Pennsylvania have filed complaints against Indra claiming that they have not authorized the enrollments submitted by Prime Connect and requesting cancellation of their accounts. As such, Prime Connect is in breach of the terms of the Agreement, which require you to adhere to applicable law in conducting marketing services on Indra's behalf.

Indra takes these matters seriously and has reached out to other customers enrolled by Prime Connect to verify the validity of their contracts and associated enrollments. Upon further investigation, Indra has reason to believe that there may be additional fraudulent activity related to the remaining customer accounts. Based on the outcome of Indra's investigation, all customer enrollments have been cancelled and the relationship with Prime Connect has been terminated effective September 10, 2024.



**Indra Energy**
1515 Market Street, Suite 1200
Philadelphia, PA, 19102

**w:** IndraEnergy.com
**e:** CustomerCare@IndraEnergy.com
**toll free:** 1 (888) 50-INDRA
1 (888) 504  6372

Please be reminded that section 3(b) of the Agreement states:

> (b) "In the event any account acquired by Consultant cancels its contract within forty-five (45) days of the date of sale, the Company shall be entitled to recoup any commission paid to Consultant for the acquisition of such account. Consultant hereby authorizes the Company to deduct any such charge-backs from subsequent commission payments that otherwise are due. If such deduction is not possible, Consultant hereby agrees to return such commission to the Company within forty-five (45) days of notification of the cancellation of the contract."

As you are aware, Indra has made several commission payments to Prime Connect for the impacted customer enrollments in the amount of $156,160.81, which have since been terminated. Per the terms of our Agreement, Indra hereby demands that you return all payments made to you for the terminated accounts, as reflected in the commission reports and invoice you received from Indra.  As required by Section 3(b) of the Agreement, Indra is entitled to those commission fees within forty-five (45) days of the date of this notice.

**Accordingly, Indra hereby demands that on or before October 27, 2024, you remit payment to Indra in the total amount of $156,160.81 representing commission payments you received for all sales that have been canceled as of the date referenced above.**

**Please remit payment to Palmco Administration LLC at 8751 18th Avenue, Brooklyn, NY 11214 via ACH or Wire at Axos Bank, Routing No. 122287251, Account No. 200100196217.**

If you fail to pay the foregoing amount on or before the date indicated above, Indra is prepared to pursue all of its rights and remedies under the Agreement and applicable law, including, but not limited to, filing a lawsuit against you for all damages caused by your willful breach of the Agreement.

This letter is without waiver of Indra's rights to demand and/or pursue claims of any damages arising from your past conduct, as well as additional damages not discovered at the time of this demand, including the recovery of any attorney's fees associated with the litigation of this matter in a court of law.  Indra further contends that nothing in this letter should be construed as a waiver or relinquishment of any claim, right, defense, or remedy that Indra may have for any other section of the Agreement or otherwise. Indra reserves all rights.



**Indra Energy**
1515 Market Street, Suite 1200
Philadelphia, PA, 19102

**w:** IndraEnergy.com
**e:** CustomerCare@IndraEnergy.com
**toll free:** 1 (888) 50-INDRA
1 (888) 504  6372

If you have any questions or concerns, please feel free to contact me at rjamal@indraenergy.com or 718-696-0115.

Thank you.

Sincerely,

Raima Jamal

Raima Jamal, Esq.
Regulatory and Corporate Counsel
**P:** 718.696.0115
1515 Market Street, Suite 1200
Philadelphia, PA 19102
www.IndraEnergy.com

CC:    npatel@primeconnectsales.com